UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| YVETTE R. ANDERSON, | ) | CIV. 11-4064-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER AFFIRMING THE |
| | ) | DECISION OF COMMISSIONER |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Yvette R. Anderson, moves for reversal of the Commissioner of Social Security's decision denying her application for supplemental security income (SSI) under Title XVI of the Social Security Act. The Commissioner opposes this motion. The court affirms.

## PROCEDURAL HISTORY

On December 3, 2007, Anderson applied for SSI and alleged an onset date of April 1, 2007. AR 122, 149.[1] On March 27, 2008, the Social Security Administration denied Anderson's application. AR 69. On April 21, 2008, Anderson requested reconsideration, which was denied on July 16, 2008. AR 72, 76. Anderson then requested a hearing before an Administrative Law Judge (ALJ). AR 79. The ALJ held a hearing on January 28, 2010, after which the ALJ determined that Anderson was not disabled, and, thus, was not entitled to SSI benefits. AR 14-

---

[1] All citations to "AR" refer to the appropriate page of the administrative record.

24. On May 3, 2010, Anderson requested that the Appeals Council review the decision. AR 8-9.

On April 1, 2011, the Appeals Council denied Anderson's request for review. AR 1. Anderson commenced this action on May 11, 2011, seeking judicial review of the Commissioner's determination that she is not disabled. Docket 1.

**FACTS**

Anderson was born July 12, 1965. AR 200. At the time of the hearing before the ALJ, Anderson was 44 years old. AR 34. Anderson went to the tenth grade in school and attended special education classes;[2] she has not received her GED. AR 34-35, 56. Anderson has alleged problems with vision, depression, anxiety, and mental retardation.[3]

Anderson has worked as a housekeeper, laborer, and clothes sorter. AR 155. She has been unable to generate a significant amount of income in any particular year, with $5,110.68 in 1993 being her largest year's income.[4] AR 145. Anderson's two most recent jobs include working as a housekeeper at a motel and as a clothes sorter, holding each position in 2007. AR 148. When asked why she no longer

---

[2] Anderson testified that she attended special education classes. AR 34-35. But in the Function Report that she filled out on February 6, 2008, she noted that she did not attend special education classes. AR 158.

[3] Because Anderson does not dispute any of the ALJ's findings regarding her depression and anxiety, the court will limit its discussion of those topics.

[4] This is the year in which Anderson worked as a laborer. AR 155. Following 1993, the highest income Anderson received was in 1996 when she earned $1,520.82. AR 145. She did not receive any income in 1998, 2001, 2002, 2005, or 2006. *Id.*

worked as a housekeeper, Anderson testified, "Because they said I wasn't doing a proper cleaning job because I didn't have these glasses then." AR 37. Anderson also testified that she left her clothes sorter position "because of stress, anxiety, and also [she] was getting sexually harassed." AR 37. Anderson currently cleans her elderly neighbor's home once a week for around $20. AR 46.

### I.     Vision Problems

On March 29, 2007, at Shopko Optical, just prior to Anderson's alleged onset date, Anderson received medical attention for her eyes for the first time since her childhood. AR 38-39, 206-207.[5] Anderson was prescribed glasses at this appointment. AR 39.

On March 4, 2008, Anderson saw Dr. Richard T. Tschetter pursuant to a referral by the Disability Determination Services. AR 208-09. Dr. Tschetter noted that Anderson "apparently has gotten along well without glasses until two or three years ago when she found that she needs them." AR 209. Anderson was diagnosed with small angle esotropia[6] and suppression amblyopia[7] in her right eye. AR 210. Dr. Tschetter determined that Anderson's visual acuity was 20/400 in her right

---

[5] The notes from Anderson's appointment at Shopko Optical note that Anderson's previous vision exam took place when she was in the fifth grade. AR 206.

[6] Esotropia, or "crossed eyes," is a form of strabismus "in which one eye turns inward, toward the nose, instead of looking straight ahead." WebMD, http://www.webmd.com/eye-health/tc/types-of-strabismus-topic-overview (last visited September 4, 2012).

[7] Amblyopia, or "lazy eye," occurs when one eye does not develop proper vision. WebMD, http://www.webmd.com/eye-health/amblyopia-directory (last visited September 4, 2012).

3

eye and 20/200 in her left eye without correction, and her visual acuity was 20/60 in her right eye and 20/30 in her left eye with correction. AR 209. Dr. Tschetter told Anderson that "she will simply have to wear the glasses to get used to them as all farsighted people, particularly with a prescription as high as she has, will get a moderate amount of magnification of all images[.]" AR 210.

Anderson was also examined by Dr. Paul Greenfield on January 7, 2009. AR 273. Dr. Greenfield's impression was that Anderson had glaucoma[8] and amblyopia, and he gave Anderson a new prescription for glasses. AR 273. Dr. Greenfield noted that Anderson "should do well with these devices." AR 273. In fact, Dr. Greenfield opined that with a new prescription, Anderson's visual acuity would be 20/30 in her right eye and 20/20 in her left eye. AR 273.

Dr. Kevin Whittle completed Anderson's residual functional capacity (RFC) assessment. AR 218. In completing the RFC assessment, Dr. Whittle noted that Anderson "does have [a] medically determinable vision impairment. However, symptomology can be improved with correction." AR 218. He also found that Anderson's near acuity is limited. AR 216. Dr. Whittle further opined that Anderson should not work in hazardous environments. AR 220.

During her ALJ hearing, Anderson testified that she can see pretty well when wearing her glasses, stating that she can read newspaper print and directions on a pizza box. AR 39-41. Anderson also testified that she has trouble

---

[8] Glaucoma "is the name for a group of eye diseases that damage the optic nerve," sometimes resulting in a loss of vision. WebMD, http://www.webmd.com/eye-health/tc/glaucoma-topic-overview (last visited September 4, 2012).

with depth perception and that she gets headaches and sick to her stomach when she wears her glasses. AR 39-40, 48-49.

## II. Mental Functioning

Anderson was referred to Dr. Elwin Unruh, a psychologist, for psychological evaluation through the Disability Determination Services of the South Dakota Department of Human Service. AR 239. Dr. Unruh performed the evaluation on July 10, 2008. AR 239.

Dr. Unruh determined that Anderson had a verbal IQ score of 71, a performance IQ score of 69, and a full scale IQ score of 67. AR 226. Dr. Unruh observed that Anderson experienced difficulties with "affect and/or motivation" because she easily became frustrated, agitated, or impulsive during the testing session and such difficulties "may warrant caution in the interpretation of her scores." AR 233-34.

Dr. Unruh diagnosed Anderson with depressive disorder, generalized anxiety disorder, and mild mental retardation. AR 243. Specifically, Dr. Unruh stated that Anderson "is currently functioning at a mildly retarded level cognitively[.]" AR 242. Anderson stated that her emotional difficulties stem from early childhood abuse by her grandfather[9] and her difficulties with her vision. AR 239. At the time of her

---

[9] Anderson indicated that her grandfather sexually molested her when she was a child and that he recently had died prior to her appointment with Dr. Unruh, causing an "increased amount of anxiety and depression for her at [that] time." AR 240.

5

meeting with Dr. Unruh, Anderson was taking Zoloft[10] and Diazepam[11] to help manage the depression and anxiety. AR 239.

On July 15, 2008, Jerry Buchkoski, Ph.D., reviewed Anderson's mental health records to complete a mental RFC assessment. AR 244-46. Dr. Buchkoski opined that Anderson is moderately limited in her ability to understand and remember detailed instructions, her ability to carry out detailed instructions, and her ability to maintain attention and concentration for extended periods. AR 244. He also noted that Anderson has the following impairments: borderline intellectual functioning, depressive disorder, and anxiety disorder.[12] AR 249, 251, 253. Dr. Buchkoski further determined that Anderson "has the ability to perform simple work-related tasks on a sustained basis, assuming she could stop drinking." AR 246.

At her ALJ hearing, Anderson testified that she had been getting treatment for her depression and anxiety at Community Falls Health[13] for about four months.

---

[10] Zoloft is "used to treat depression, obsessive-compulsive disorder, panic disorder, anxiety disorders, post-traumatic stress disorder (PTSD), and premenstrual dysphoric disorder[.]" Drugs.com, http://www.drugs.com/zoloft.html (last visited September 4, 2012).

[11] Diazepam is "used to treat anxiety disorders, alcohol withdrawal symptoms, or muscle spasms." Drugs.com, http://www.drugs.com/diazepam.html (last visited September 4, 2012).

[12] Dr. Buchkoski did not note that Anderson suffered from any impairment regarding mental retardation under 12.05. AR 252.

[13] Community Falls Health was also referred to as "Fall River Community Health" and "Falls Community Health" in the transcript. AR 54.

AR 43. Anderson noted that she was taking Zoloft, Diazepam, and Ambien.[14] AR 44. She stated that the medications helped her with her moods and her ability to sleep, but Anderson also noted that she still suffers from stress, anxiety, and depression. AR 45.

## ALJ DECISION

On April 5, 2010, the ALJ issued a decision denying Anderson's applications for SSI benefits. AR 24. The ALJ used the sequential five-step evaluation process.[15] At the first step, the ALJ determined that Anderson never engaged in substantial gainful activity. AR 16. At step two, the ALJ found that Anderson has the following severe impairments: "borderline intellectual functioning, depression, anxiety disorder, small angle esotropia in the right eye, mild suppression amblyopia in the right eye, suspected glaucoma, 20/60- visual acuity in the right eye with correction and 20/30- visual acuity in left eye with correction[.]" AR 16. The ALJ also determined that Anderson's alcohol use "is not a medically determinable impairment." AR 17. At step three, the ALJ found that Anderson does not have an impairment or a combination of impairments that meet or equal a listed

---

[14] Ambien is "used to treat insomnia." Drugs.com, http://www.drugs.com/ambien.html (last visited September 4, 2012).

[15] An ALJ must follow " 'the familiar five-step process' " to determine whether an individual is disabled: "(1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work." *Martise v. Astrue*, 641 F.3d 909, 921 (8th Cir. 2011) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)); *see also* 20 C.F.R. § 416.920 (detailing the five-step process).

impairment. AR 17-18. At step four, the ALJ concluded that Anderson has the RFC "to perform medium work . . . except that she cannot perform tasks requiring attention to fine visual detail nor can she work around hazards. Mentally, [Anderson] is limited to simple routine work." AR 19. The ALJ further noted that Anderson should have limited contact with the public. AR 19. At step five, the ALJ determined that while Anderson does not have any past relevant work, she is able to perform some jobs that exist in the national economy. AR 22, 23. Thus, the ALJ concluded that Anderson was not disabled.

## STANDARD OF REVIEW

An ALJ's decision must be upheld if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). "Substantial evidence is 'less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006)). In determining whether substantial evidence supports the ALJ's decision, the court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010) (internal citation omitted). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have determined the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

In determining whether the Commissioner's decision is supported by substantial evidence, the court reviews the entire administrative record and considers six factors: (1) the ALJ's credibility determinations; (2) the claimant's vocational factors; (3) medical evidence from treating and consulting physicians; (4) the claimant's subjective complaints relating to activities and impairments; (5) any third-party corroboration of claimant's impairments; and (6) a vocational expert's testimony based on proper hypothetical questions setting forth the claimant's impairment(s). *Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (citing *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed de novo with deference accorded to the Commission's construction of the Social Security Act. *Id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

## DISCUSSION

Anderson argues that the ALJ made three reversible errors: (1) the ALJ failed to include severe impairments at step two; (2) the ALJ erred in ruling that Anderson's mental impairment did not meet Listing 12.05C at step three; and (3) the ALJ erred in ruling that Anderson can work at step five.

**I.     Severe Impairments**

Anderson argues that the ALJ erred when she failed to include mild mental retardation as a severe impairment at step two. At step two of the sequential evaluation process, Anderson must establish that she has a medically determinable physical or mental impairment that is severe. 20 C.F.R. § 416.920(a)(4)(ii); *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) ("It is the claimant's burden to establish that [her] impairment or combination of impairments are severe." (citation omitted)). A severe impairment must "significantly" limit the claimant's physical or mental ability to do basic work activities, 20 C.F.R. § 416.920(c), such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, understanding, remembering simple instructions, using judgment, responding appropriately to usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. §§ 416.921(b)(1)-(6). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs. 20 C.F.R. § 404.1521(b).

At step two, the ALJ determined that Anderson is of borderline intellectual functioning and not mildly mentally retarded, despite Anderson's full scale IQ score of 67. "Borderline intellectual functioning is a condition defined as an IQ score within the 71-84 range, while mental retardation is a score of about 70 or below." *Hutsell v. Massanari*, 259 F.3d 707, 709 (8th Cir. 2001) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 39-40, 684 (4th ed. 1994)); *see also Moore v. Astrue*, 623 F.3d 599, 601 (8th Cir. 2010) (noting that an IQ score in the high 60s is a range associated with mild

retardation). An ALJ is not required to accept proffered IQ scores and may reject scores that are inconsistent with the claimant's daily activities, medical history, educational background, and behavior. *Miles v. Barnhart*, 374 F.3d 694, 699 (8th Cir. 2004); *Bailey v. Apfel*, 230 F.3d 1063, 1065-66 (8th Cir. 2000).

Substantial evidence in the record supports the ALJ's decision to discredit Anderson's IQ score. As an initial matter, the psychologist who administered the IQ examination, Dr. Unruh, was not Anderson's treating psychologist and only met with Anderson on one occasion. *See Clark v. Apfel*, 141 F.3d 1253, 1256 (8th Cir. 1998) ("A one-time evaluation by a non-treating psychologist is not entitled to controlling weight."). Dr. Unruh cautioned that Anderson's "affect and/or motivation difficulties may have affected her performance which may warrant caution in the interpretation of her scores." AR 21, 234. Further, Anderson has not introduced any additional medical records that illustrate her cognitive difficulties; she relies solely on Dr. Unruh's IQ determination. *See McGee v. Astrue*, 291 Fed. App'x 783, 787 (8th Cir. 2008) (finding that an IQ determination was inconsistent with claimant's medical history when there was no other evidence of cognitive difficulties in claimant's medical records); *see also Kirby*, 500 F.3d at 707 ("It is the claimant's burden to establish that [her] impairment or combination of impairments are severe.").

Additionally, the ALJ noted that Anderson can read and understand a short newspaper or magazine article, count out change, and feed and care for her cat and dog. *See Clark v. Apfel*, 141 F.3d 1253, 1256 (8th Cir. 1998) (finding that an ALJ properly rejected IQ scores where scores were inconsistent with claimant's

11

daily activities of reading, writing, counting money, driving, cooking, cleaning, and shopping). The record also shows that Anderson once had a driver's license and that she is capable of cooking, cleaning, and shopping. AR 46, 162-63. Moreover, Anderson's testimony does not indicate that her poor work record was a result of her mental impairment, but instead she alleges that it was caused by her vision problems and harassment. *See Miles v. Barnhart*, 374 F.3d 694, 699 (8th Cir. 2004) (finding that an ALJ properly discredited claimant's IQ score because claimant "had never been terminated from a job for lack of mental ability"). Indeed, when asked about her past jobs, Anderson testified that she could "learn them real well." AR 38.

In her brief, Anderson argues that her education is proof of her mental impairment. She points out that she only made it to the tenth grade and received special education services throughout her academic career. But evidence in the record weakens her argument. The record suggests that Anderson discontinued school because she was pregnant, not because of mental difficulties. AR 239-40. Also, Dr. Unruh noted that Anderson "does have goals of completing a GED[.]" AR 242.

After examining the record as a whole, the court finds that there is substantial evidence that supports the ALJ's determination to discredit Anderson's IQ score. *See McGee*, 291 Fed. App'x at 786 ("We must affirm if the ALJ's decision is supported by substantial evidence in the record as a whole.") (citation omitted).

**II.     Step 3 and Listing 12.05C**

Anderson next argues that the ALJ erred at Step 3 when she failed to address Listing 12.05C. To meet Listing 12.05C, a claimant must show: (1) that she suffered deficits in adaptive functioning; (2) a valid verbal, performance, or full scale IQ of 60 through 70; (3) an onset of the impairment before age 22; and (4) a physical or other mental impairment imposing an additional and significant work-related limitation of function. *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006); *Cheatum v. Astrue*, 388 Fed. App'x 574, 576 (8th Cir. 2010); 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.05. As determined above, the ALJ relied on substantial evidence when she discredited Anderson's IQ scores and found that she was of borderline intellectual functioning, implying that she has an IQ greater than 70. Absent a valid IQ score between 60 and 70, Anderson cannot meet Listing 12.05C, and the ALJ was not required to address it in her findings.

Even if the court were to find that the ALJ erred when she discredited Anderson's IQ scores, Anderson still does not qualify for SSI under Listing 12.05C because she failed to show deficits in adaptive functioning. When considering whether a claimant has deficits in adaptive functioning, courts review whether the claimant has successful social relationships, has physical problems, exhibits self-sufficient behavior, or has limitations in her concentration, persistence, or pace. *See Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007). The ALJ addressed these areas in her findings even though she did not explicitly do so under the veil of a 12.05C analysis. The following is a summary of the ALJ's findings.

With regard to social relationships, Anderson testified that she has lived with her roommate for two years and has other friends in addition to her roommate. AR 36, 45. She also cleans her neighbor's house once a week. Anderson's self-sufficient behavior includes her abilities to shop, clean, cook, count out change, take walks, and care for pets. The only physical problem Anderson alleged was her poor vision. The ALJ, however, found that "her treatment and prescription for glasses has generally been successful in correcting her vision." AR 21.[16] The ALJ found that Anderson has moderate difficulties with her concentration, persistence, or pace. The only evidence to support a finding that Anderson has more than just a "moderate" difficulty is her IQ score and her education history. As discussed above, there is substantial evidence in the record to discredit the IQ score and call into question the relevance of the education history. In light of these determinations by the ALJ which were supported by substantial evidence in the record, the court finds that Anderson failed to show deficits in adaptive functioning as required under 12.05C.

## III.  Step 5—Ability to Work

Anderson's final argument alleges that the ALJ erred when she found that there are jobs that exist in significant numbers in the national economy that Anderson can perform. Specifically, Anderson argues that the ALJ erred by not

---

[16] There is substantial evidence in the record that supports the ALJ's finding. Anderson's most recent eye appointment with Dr. Greenfield shows that Anderson's visual acuity with her glasses is 20/30 in her right eye and 20/20 in her left eye. AR 273. Also, Anderson's testimony indicates that she sees well with her glasses but has problems with depth perception.

including additional limitations in her hypothetical questions to the vocational expert. Further, Anderson argues that the ALJ's finding conflicts with the Dictionary of Occupational Titles (DOT).

### A. Sufficiency of Hypothetical Questions Posed to Vocational Expert

Anderson argues that the ALJ's hypothetical questions should have included Anderson's difficulties with depth perception and reaching.[17] "The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (citation omitted). "[T]he hypothetical question need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the concrete consequences of those impairments." *Id.* (citation omitted). The transcript shows that the ALJ's hypothetical questions and the vocational expert's answers each mention Anderson's depth perception. When questioning the vocational expert, the ALJ specifically said Anderson has "a bigger problem with depth perception" than visual acuity. AR 62. Likewise, the vocational expert discusses the role depth perception plays in performing the duties of a motel maid. AR 61-62. Thus, the hypothetical questions posed to the vocational expert captured the concrete consequences of Anderson's impairments.

---

[17] It is necessary to point out that Anderson does not allege that she has physical difficulties in reaching. Her argument is that her depth perception causes her to have problems reaching for objects. Thus, her sole objection to the ALJ's hypothetical question is that it did not address her difficulties with depth perception.

15

### B. ALJ's Findings and DOT

Lastly, Anderson argues that the ALJ's conclusion that Anderson can work as a hand packager or motel maid conflicts with the descriptions of those positions in the DOT. "A claimant's reliance on the DOT as a definitive authority on job requirements is misplaced because DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position[.]" *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010). "The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities." *Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000). Therefore, as a general matter, the ALJ was not required to strictly comply with the language in the DOT when she considered jobs that Anderson was capable of performing.

Even though strict compliance with the DOT is unnecessary in this instance, the ALJ did fully comply with the DOT's description of motel maid when she found that Anderson could perform such work. Anderson argues that pursuant to the DOT, working as a maid requires frequent reaching. As noted above, Anderson does not allege that she has physical difficulties while reaching. Rather, she claims that her depth perception is the problem. The vocational expert noted in his testimony that the DOT does not indicate that depth perception is required for performing the position of a motel maid. *Dictionary of Occupational Titles*, 323.687-014 (cleaner, housekeeping) (4th ed. 1991) (*available at* 1991 WL 672783). Thus,

the ALJ's determination that Anderson could work as a motel maid complied with the DOT's description of the position.[18]

In summary, the record and the vocational expert's testimony support the ALJ's conclusion that Anderson could perform certain available jobs in the national economy.

**CONCLUSION**

Following review of the record, the court finds that substantial evidence supports the ALJ's finding that Anderson is not disabled. The ALJ relied on substantial evidence in the record to discredit Anderson's IQ scores. Without a valid IQ score, Anderson was not able to show a listing level impairment. Further, the ALJ properly concluded that Anderson could perform jobs that exist in the national economy. Accordingly, it is

ORDERED that Anderson's motion for summary judgment (Docket 12) is denied, and the decision of the Commissioner is affirmed.

Dated September 4, 2012.

        BY THE COURT:

        */s/ Karen E. Schreier*
        KAREN E. SCHREIER
        CHIEF JUDGE

---

[18] Indeed, Anderson's daily activity also supports the ALJ's conclusion. Anderson testified that she cleans her neighbor's house once a week.